Acme Pie Company, a Michigan Corporation v. Commissioner.
Acme Pie Co. v. Commissioner
Docket No. 20870.
United States Tax Court
1951 Tax Ct. Memo LEXIS 345; 10 T.C.M. (CCH) 97; T.C.M. (RIA) 51029; January 25, 1951
*345 1. Amount of reasonable compensation for two of petitioner's officers for the years 1942, 1943 and 1944 determined. 2. Held, expenditure for replacement of windows in petitioner's plant during the year 1944 should be capitalized as the respondent determined. Roy F. Andes, Esq., and Mel W. Werden, C.P.A., 7310 Woodward Ave., Detroit 3, Mich., for the petitioner. *346 A. J. Friedman, Esq., for the respondent. HILL Memorandum Finding of Fact and Opinion The respondent determined deficiencies in petitioner's taxes for the years 1942, 1943 and 1944 as follows: Year
Deficiency
1942
Declared value excess-profits tax
$ 389.51
Excess profits tax
16,897.13
1943
Declared value excess-profits tax
475.41
Excess profits tax
16,952.81
1944
Excess profits tax
17,121.86
There are three issues before the Court: (1) Were the amounts paid by the petitioner as compensation to John P. Homchis, Sr., and John P. Homchis, Jr., for the years 1942, 1943 and 1944 reasonable? (2) Did respondent err in determining that contributions made by petitioner during 1942, 1943 and 1944 on behalf of John P. Homchis, Sr. and John P. Homchis, Jr. to a tax-exempt pension trust were not deductible because, when added to the other compensation paid to those officers, they represented excessive compensation for services performed? (3) Did respondent err in determining the cost of replacing factory windows in 1944 in the amount of $1,350 should be capitalized rather than deducted as an ordinary and necessary business *347 expense under section 23 (a) (1) (A) of the Internal Revenue Code? The pleadings also raised an issue as to the deductibility in 1943 of the cost of repairs to the roof of the factory building in the amount of $792. The respondent, however, conceded on brief that such amount was deductible in 1943. Findings of Fact Part of the facts have been stipulated and they are so found. Issues 1 and 2. The petitioner was incorporated under the laws of the State of Michigan on March 23, 1931, with an authorized capital stock of 5,000 shares of common stock with a par value of $10 per share. It has kept its books and filed its Federal tax returns at all times on an accrual method of accounting and for the years in issue was on the calendar year basis. Its Federal tax returns were filed with the collector of internal revenue for the district of Michigan at Detroit. Petitioner's origin and growth primarily are attributable to the efforts of John P. Homchis, Sr., (hereinafter referred to as senior). He was born in Lithuania and came to the United States in 1910 when he was 18 years of age. He lived in East St. Louis, Illinois, from November 1910 until 1915. He then *348 went to Detroit. There he married Mary Homchis. They have two children, John P. Homchis, Jr., (hereinafter referred to as Junior) and Suzanne Homchis. Senior's first employment after coming to the United States was as a salesman for a baking company in East St. Louis, Illinois. While working for this company he learned about the baking business. During this period he also attended night school in order to learn the English language and arithmetic. In 1915 while visiting Detroit he became interested in a bakery there. He purchased this bakery and operated it with the help of his sister and her husband. He later opened a second retail bakery in Detroit and also began to sell baked goods at wholesale to stores in and around Detroit. During World War I he sold both bakeries and took a job with Ford Motor Company. After the war he did odd jobs in the mechanical field as an automobile repairman. In 1922 he purchased another bakery in Detroit for $5,000 which he operated until the fall of 1923. He sold this bakery in that year for $10,000, plus inventories. In 1923 he purchased another bakery. He operated this as an individual under the name of Acme Pie Company. In this business he *349 was engaged exclusively in making pies. Senior operated this business as an individual until 1924 when he formed an equal partnership with one Peter J. LeCody. LeCody made no capital contributions to the business. He was taken into the business because of his business connections. In 1925 the business moved to a new location. It grew rapidly. In 1926 LeCody became purchaser and general manager. His duties were to hire the help and buy raw material, while Senior solicited business, supervised sales, attended to the financing and other administrative duties. This arrangement between Senior and LeCody continued until 1930 when the latter took a vacation for 90 days in order to go to Greece. Upon his return to the United States he failed to return to Acme Pie Company but instead went into the frozen apple business in Buffalo, New York. At that point, a conflict developed between Senior and LeCody. Senior consulted an attorney and was told that it would be wise for him to incorporate the business. Accordingly, it was incorporated March 23, 1931. At that time Senior's wife, Mary, sold the real estate upon which the bakery was located to petitioner for $50,000 over and above all indebtedness *350 and liabilities. Petitioner assumed liabilities in connection with the real estate which it has paid off with the exception of a very small amount. The stock ownership in petitioner at the time of its incorporation through the years in question is disclosed by the following table: 1933
thru
1939
1931
1932
1937
1938
1940
1941
1942
1943
1944
John P. Homchis, Sr.
2,495
195
195
195
195
250
250
250
1,500
Mary Homchis (wife of John
Homchis)
5
5
5
5
5
75
75
75
690
Peter J. LeCody
2,495
195
195
Minnie LeCody (wife of Peter J.
LeCody)
5
5
5
Suzanne Homchis (daughter of
John P. Homchis)
75
75
75
210
Shares in escrow - not voted
* 200
* 200
Totals (Shares)
5,000
400
400
400
400
400
400
400
2,400
At a meeting of the board of directors held on March 23, 1931, the following resolutions were adopted concerning the *351 compensation to be paid to Senior and LeCody: "RESOLVED: That John P. Homchis be and he is hereby employed as the General Manager of the business of the corporation at a weekly salary equal to two percent (2%) of the gross weekly sales of the corporation and to serve in such capacity during the pleasure of the Board of Directors and to give his full time and attention to the affairs of the corporation. "RESOLVED: That Peter J. LeCody as Vice-President be required to give his full time and attention to the affairs of the corporation and that his weekly salary be fixed at 2% (two percent) of the weekly gross sales of the corporation, such salary to continue during the pleasure of the Board of Directors. If said Peter J. LeCody shall not for any reason give his full time and attention to the business of the corporation then some capable person shall be selected by him who shall be approved by the General Manager to perform the services in his place and stead and any compensation paid to the person selected shall be chargeable against and deducted from the compensation payable to said Vice-President." In accordance with the action of the board of directors of petitioner the authorized *352 salaries of Senior and LeCody were as follows: From March 23, 1931 through
1936
2% of gross sales
1937
2% of gross sales, but not to exceed
$14,125
1938
2% of gross sales, but not to exceed
$15,000
In 1938, because of an irreconcilable conflict between Senior and LeCody, Senior purchased LeCody's interest in petitioner. The authorized salary of Senior from 1939 through 1944 was as follows: 1939
2% of gross sales, but not to exceed
$15,000
1940
3% of gross sales, but not to exceed
$17,500
1941
3% of gross sales, with a maximum
of $22,500
1942
3% of gross sales, but not to exceed
$22,500
1943
3% of gross sales, but not to exceed
$22,500, plus traveling expenses not to
exceed $100 per week
1944
3% of gross sales with a maximum of
$22,500, plus traveling expenses not to
exceed $100 per week
Senior's compensation for the years 1932 to 1944, inclusive, was as follows: 1932
$ 2,332.59
1933
2,529.29
1934
6,855.27
1935
10,664.28
1936
15,680.00
1937
14,125.00
1938
11,526.79
1939
12,500.00
1940
17,300.00
1941
15,706.66
1942
15,600.00
1943
15,700.00
1944
15,680.00
During *353 the years 1942, 1943 and 1944 petitioner operated 28 trucks in the Detroit area. It also sold pies in areas outside of Detroit, such as Traverse City and Cadillac, Michigan. Shipments to these areas were sometimes made by rail. Petitioner's use of truck transportation was curtailed about 20 per cent during 1943 and 1944 due to the regulations of the Office of Defense Transportation. In addition to the 28 trucks which petitioner operated in the Detroit area it also had an arrangement with 19 or 20 independent truck owners outside of Detroit who have a special designation known in the trade as "bob tailers". A "bob tailer" is one who deals in pies and other baked goods, operates his own truck but has painted on the side of the truck the name of petitioner. He pays all expenses of operating the truck. He receives a large discount over and above the usual one given by petitioner to its ordinary customers. In certain instances petitioner financed the purchase of the trucks used by these so-called "bob tailers". During the years in question petitioner had an average of 128 or 129 employees. Seventy-five percent of these employees were paid on an hourly basis, whereas the rest were paid *354 on a salary and commission basis. During the years in issue the average working week of the employees of the baking industry was about 48 hours. In 1942, 1943 and 1944 petitioner was in operation night and day, seven days a week. Its employees included dough mixers, fruit cookers, soft pie bakers, receivers, porters, wrappers, shipping clerks, loaders and checkers. There was no baking done on the premises on Saturday during the period in question, but the truck drivers worked on that day. On the other hand, the truck drivers did not work on Sunday, but the bakers did. The petitioner is located in a 2-story building, 120 feet wide by 108 feet deep, and has a total usable area of about 25,000 square feet distributed over both floors. There is another Acme Pie Company, an Ohio corporation, located in Cleveland, Ohio. Senior purchased this company in 1934. During 1942, 1943 and 1944 the issued and outstanding capital stock of that company was owned as follows: John P. Homchis, Sr.
148 shares
Mary Homchis, his wife
1 share John P. Homchis, Jr.
143 shares
Marie Homchis, his wife
1 share During 1942, 1943 and 1944, Senior was president and general manager *355 of petitioner. His duties included hiring employees, buying raw materials and supervising the sales department which had salesmen in Detroit and in the States of Michigan and Indiana. He also formulated the recipes for baking pies sold by petitioner. It was sometimes necessary to change the recipes or formulae for pies four or five times a year because of climatic conditions. In addition, Senior was chief purchasing officer of petitioner. There was a variety of fruits which it was necessary for him to buy during the years in question. He also purchased pumpkins, mincemeat, raisins, liquid and granulated sugar and other things necessary in the pie making business. Senior purchased the fruits and many other products directly from the growers or producers in various sections of the country, in this way saving petitioner substantial sums of money by eliminating the jobbers' commissions. The products which petitioner used in its pies came from all over the United States as well as from Cuba, Puerto Rico, the Hawaiian Islands and sometimes Mexico. During the war years Senior traveled between 30,000 and 40,000 miles by automobile and train visiting different areas where he purchased fruits *356 and berries. During 1942, 1943 and 1944 Senior negotiated all the union contracts with the officers of the three unions represented among petitioner's employees. This resulted in substantial savings each year for petitioner through the elimination of legal fees. Senior has devised several articles used in and about the bakery which accounted for increased efficiency and substantial savings of money. One such article is called "peel" which is a large spoon-like object with a long handle which is useful in removing pies from hot ovens. He also adopted a revolving table for use in his business. He designed paper cartons for packaging pies. He aided in designing a bagging machine which is useful in inserting pies in paper bags. During 1942, 1943 and 1944 Senior worked between 15 and 20 hours a day. Senior belonged to no clubs or lodges. He owned no boats, played no golf nor fished during the years in question. He took his last vacation in 1940 when he went to Florida for 13 days. Although during the years in question Senior was in Cleveland from time to time looking after the affairs of the Acme Pie Company of Ohio, he spent most of his time working for petitioner. At the time *357 of the hearing Junior was 31 years old. He resides in a suburb of Cleveland, Ohio. Junior first started to work for petitioner in 1934 during vacations from high school. His services at that time consisted of scrubbing floors, washing pie tins, mixing dough and other small jobs. After graduating from high school, Junior attended several different universities. He was graduated from college in 1938 with a major in economics. He first became regularly employed by the Cleveland company in 1938 at which time he was made president. Junior also became an officer of petitioner in the early part of 1939 and continued in that capacity until December 1, 1943, when he resigned his positions from both petitioner and the Cleveland company. He entered the United States Army on December 3, 1943. He was discharged February 15, 1946. Junior performed some administrative duties with the Cleveland company until resignation in December 1943. Before entering military service Junior spent most of his time working for Acme Pie Company of Cleveland. Only about 25 per cent of his time was spent in petitioner's employ in 1942 and in 1943 prior to his entering military service. Junior's authorized compensation *358 from petitioner from 1939 through 1942 was as follows: 1939 $50 per week
1940 $50 per week
1941
1 1/2 per cent of gross sales but not to
exceed $10,000
1942
1 1/2 per cent of gross sales but not to
exceed $12,500 The amount of compensation paid by petitioner to Junior from 1939 through the years in question was as follows: 1939
$ 2,725.00
1940
2,616.68
1941
5,976.66
1942
10,483.36
1943
10,466.64
1944
10,500.00
The amount of compensation reported by petitioner as being paid to Senior and Junior in 1942, 1943 and 1944, and the amount disallowed by respondent is disclosed by the following table: Senior
Junior
Total
Per Return
Allowed
Disallowed
Per Return
Allowed
Disallowed
disallowed
1942
$15,600
$9,000
$6,600
$10,483.36
$3,333.33
$7,150.03
$13,750.03
1943
15,700
9,000
6,700
10,466.64
3,333.34
7,133.30
13,833.30
1944
15,680
9,000
6,680
10,500.00
3,333.34
7,166.66
13,846.66
The ratio of total officers' salaries to gross sales for each year from 1932 to 1944, inclusive, was as follows: Total
Gross
Officers'
Year
Sales
Salaries
Ratio
1932
$121,081.34
$ 4,374.41
3.61%
1933
152,026.63
5,058.58
3.33
1934
278,699.17
13,710.54
4.92
1935
455,765.22
21,328.56
4.68
1936
670,254.62
* 31,360.00
4.68
1937
845,508.38
28,250.00
3.34
1938
576,339.33
19,823.93
3.44
1939
603,690.83
15,225.00
2.52
1940
623,672.56
19,916.68
3.19
1941
768,797.29
21,683.32
2.82
1942
790,544.22
26,083.36
3.30
1943
860,541.38
26,166.64
3.04
1944
872,708.17
26,180.00
3.00
*359 The total assets of petitioner for the years 1938 to 1944, inclusive, were as follows: 1938
$163,979.34
1939
150,688.41
1940
159,335.20
1941
198,015.11
1942
231,772.20
1943
240,842.85
1944
242,779.04 Its net worth for the years 1938 to 1944, inclusive, is disclosed by the following table: 1938
$ 51,129.46
1939
52,196.76
1940
62,534.03
1941
81,857.53
1942
96,587.26
1943
116,408.00
1944
133,543.24 Petitioner's gross sales, expenses, reported net profits and dividends paid for the years 1938 through 1944 were as follows: Dividends
Reported
Year
Gross Sales
Expenses
Net Profits
Cash
Stock
1938
$576,339.33
$122,546.70
$ 1,588.96
1939
603,690.83
129,234.61
2,937.94
1940
623,672.56
140,390.65
11,196.14
1941
768,797.29
162,001.77
34,537.57
$2,000.00
1942
790,544.22
169,467.95
32,214.46
2,000.00
1943
860,541.38
186,514.99
61,237.61
2,000.00
1944
872,708.17
182,707.38
43,088.28
4,000.00
$20,000.00
The following is a tabulation of petitioner's surplus balances for the years 1938 through 1944: December 31,
Total
Capital
Earned
1938
$ 47,129.46
$38,476.14
$ 8,653.32
1939
49,196.76
38,476.14
10,720.62
1940
58,534.03
38,476.14
20,057.89
1941
77,857.53
38,476.14
39,381.39
1942
92,587.26
38,476.14
54,111.12
1943
112,408.00
38,476.14
73,931.86
1944
109,543.24
38,476.14
71,067.10
*360 On December 30, 1940, petitioner, by John P. Homchis, Sr., as president, and John P. Homchis, Jr., as vice-president, executed an employees' pension trust agreement. Thereafter on March 20, 1941, Senior and two others became successor trustees of such pension plan. The employees' pension trust was amended on March 20, 1941. It was further amended on August 31, 1943, and again on October 28, 1944. On November 15, 1944, a Deputy Commissioner of the Bureau of Internal Revenue wrote a letter to petitioner informing it that the pension trust plan as submitted would meet the requirements of section 165 (a) of the Internal Revenue Code, as amended. On November 16, 1944, a Deputy Commissioner wrote a letter to petitioner notifying it of a ruling that the pension plan would meet the requirements of section 165 (a) of the Code, as amended, and that the trust was exempt under the provisions thereof. The following amounts were paid into the pension trust fund by petitioner for Senior and Junior during the years involved: 1942
1943
1944
Senior
$3,824.50
$3,824.50
$3,824.50
Junior
726.50
726.50
726.50
The respondent determined that *361 those amounts, when added to the other compensation of Senior and Junior, constituted excessive compensation and disallowed the deduction therefor. Reasonable compensation for services performed by Senior during the years involved was in the amounts actually paid by petitioner. The amount contributed by petitioner into the pension trust on behalf of Senior likewise was reasonable. Reasonable compensation for Junior during the years involved was in the amount determined by respondent. The amount contributed by petitioner to the pension trust on behalf of Junior when added to his other compensation was excessive. Issue 3. Prior to 1944 petitioner's factory windows were of steel construction and of the type commonly known as fenestra steel windows. By 1944 they had become rusted through. The windows were about 7 feet wide by 8 feet high with 2 swing windows that opened for ventilation. Steam and acid from fruit cooking damaged the steel to the extent that the City Safety Commissioner ordered the company to replace all window glass. Due to the damaged condition of the steel frames the glass would repeatedly break from vibration and shaking when heavy trucks passed petitioner's plant. *362 During the war it became impossible to obtain the steel fenestra windows so as an alternative petitioner installed glass blocks in place of those windows and closed the openings. For the purpose of ventilation, small windows that could be opened were inset in the glass block construction. The window frames for these were made of wood. Due to a reduction in the size of the window, the union and employees complained of insufficient ventilation as a result of which petitioner installed fans and skylights in order for steam to escape and for the intake of fresh air. The expenditure for replacement of the windows by petitioner in 1944 was in the amount of $1,350. The respondent determined that such expenditure should be capitalized. Opinion HILL, Judge: Issue 1. The first question concerns the reasonableness of the compensation paid to petitioner's officers, John P. Homchis, Sr., and John P. Homchis, Jr. during the years 1942, 1943 and 1944. See section 23 (a) (1) (A), Internal Revenue Code. This question basically is one of fact and accordingly we have set forth in our findings what we hold to be reasonable compensation for services performed in these years. *363 "Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case." Mayson Mfg. Co. v. Commissioner, 178 Fed. (2d) 115. The Court in that case set forth those factors as follows: "* * * Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. Ox Fibre Brush Co. v. Blair, 4 Cir., 32 Fed. (2d) 42, 45, 68 A.L.R. 696 *364 (2d) 171, 172; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir. 131 Fed. (2d) 712, 715. The situation must be considered as a whole with no single factor decisive." From the organization of petitioner in 1931 through the year 1944 Senior's work was the principal factor in its growth and development. During that period petitioner grew from a comparatively humble beginning to the third largest bakery and the second largest pie bakery in the Detroit area. Since 1938, when Senior formally took over all the administrative duties after the purchase of LeCody's interest, through the years in question, he performed duties as president, sales manager, buyer, production manager, and head of labor relations. During the years in question he worked on an average of from 15 to 20 hours a day in petitioner's activities. We have set forth specifically in our findings the diversified functions he performed for petitioner. Briefly they included the hiring and firing of employees and purchasing fruits, materials and supplies used in baking pies which were difficult to obtain during 1942, 1943 and 1944 due to wartime restrictions. He was generally recognized in the industry as a *365 shrewd buyer and because he purchased the products used in the baking of pies directly from the producers, he saved petitioner substantial sums of money during all of the years before us by eliminating jobbers' commissions. He supervised the sales department for Detroit, the States of Michigan and Indiana, and, in addition, solicited new accounts. He looked after the financial problems of petitioner and prepared and changed baking formulae necessitated by changing climatic conditions. He negotiated all of the contracts with the three unions represented among petitioner's employees and he supervised the office force. He also adapted and invented gadgets and devices which were used in the bakery and financially beneficial in petitioner's operations. Six witnesses, who were well qualified to voice an opinion on the subject by virtue of their training and experience in the baking industry, testified that Senior was by reputation one of the most able, hardworking, and efficient executives in the baking industry in the Detroit area. One of the expert witnesses testified that Senior's services during the years involved were worth at least $35,000 yearly to petitioner. That Senior's efforts *366 as above described have produced results is disclosed by the following. From 1938 when Senior took over all of the administrative duties, through 1944, petitioner's surplus balances increased from $47,129.46 to $109,543.24, and during that same span its profits rose from $1,588.96 to $43,088.28. In that period its assets increased from $163,979.34 to $242,779.04; and its net worth from $51,129.46 to $133,543.24. In addition to the above considerations it should also be noted that the basis for Senior's compensation during the years in question was set in 1931 when Senior and his wife held only 50 per cent of the corporation's stock. At that time his rate of compensation was set at 2 per cent of gross sales and from that period through 1944 this basic ratio was changed only once, in 1940, when the percentage was increased from 2 per cent to 3 per cent of gross sales. It is true that after 1938 petitioner was controlled by the Homchis family, yet it will be noted that all through the years the ratio of total officers' salaries to gross sales remained fairly constant. The compensation paid Senior during the years in question was not as high as that paid him in previous years. It *367 is also true that during the years in question Senior did spend a portion of his time in the plant of Acme Pie Company of Ohio in Cleveland. The evidence here, however, clearly shows that he was in petitioner's employ during the years in question and working in its activities most of the time. We therefore hold after a consideration of all the circumstances of the case that Senior's compensation was reasonable in the amount actually paid by petitioner and that the amounts paid by petitioner to Senior during the years 1942, 1943 and 1944 are properly deductible. With respect to Junior, however, we have found that respondent's determination of the amount of reasonable compensation for each year was proper. He entered the military service in December 1943 and after that time performed little or no services for petitioner. The record is clear, moreover, that he did little or nothing for petitioner prior to that time. This is shown by the following testimony of Senior: "Q. You consider you are one of the top men in that business, in 1942, '43 and '44, do you not? "A. Well, in my own ground, I don't have to worry with no competitors, no matter bigger or larger, I can stand and fight. *368 "Q. If I said you were probably a one-man band in the Acme Pie Baking Company, would that pretty nearly be a correct statement? "A. Just about, unless you go out and hire for different branches, different men. "Q. You would consider that situation to be true in 1942, '43, as well as in 1944? "A. That is right." The evidence further discloses that Junior was in Detroit attending to the affairs of petitioner during only a minor portion of his working time during 1942, and 1943. Most of his time was occupied by his duties in connection with the Acme Pie Company located in Cleveland. True, Junior testified that he was convinced that he knew more about the pie making business than Senior, that he designed and installed two or three time-saving devices and that he was manager of the pension trust setup. We nevertheless believe that the evidence fails to overcome the respondent's determination of the amounts allowable as reasonable compensation for Junior during the years in question. We think that so large a salary would not have been paid to Junior during such years except for the family relation among those in control of petitioner's activities. We therefore hold that petitioner *369 is entitled to deductions on account of compensation paid to Junior during 1942, 1943 and 1944 only in the amounts determined by respondent. Issue 2. The question of whether the contributions made by petitioner during the years in question on behalf of Senior and Junior into the approved employees' pension trust plan were deductible as reasonable compensation for services performed is directly related to issue 1. The reasoning set forth under our discussion of issue 1 is applicable with the same force and effect here. We have therefore found as a fact and hold that the amounts paid into the pension trust fund for Senior were reasonable and properly deductible by petitioner during 1942, 1943 and 1944, but that the amounts paid into such fund on behalf of Junior were not. See Regulations 111, section 29.23 (p)-1. With respect to issues (1) and (2), the petitioner, on brief, objected to the introduction by the respondent of a portion of the record involving the Acme Pie Company of Ohio, Docket No. 6529, in which this Court entered a memorandum decision on August 30, 1946 [5 TCM 760]. Its objection is based on the ground that it was "* * * incompetent, irrelevant and *370 immaterial, and, * * * [was] not res judicata of any issue in the instant case." We have not considered the record in the proceeding involving the Ohio corporation, except those portions of it properly introduced to contradict the testimony of the witnesses here who also testified in the other proceedings. See 3 Jones on Evidence, (4th Ed. 1938), section 845, pages 1563, 1564. Respondent does not claim nor do we hold that the doctrine of res judicata has any application in the instant proceeding. Issue 3. The third question relates to respondent's disallowance as deductible expense under section 23 (a)(1)(A) the cost of replacing windows in petitioner's building in 1944 in the amount of $1,350. The respondent claims that such expenditures should be capitalized. The respondent conceded on brief that the cost of repairing the roof of petitioner's plant in 1943 was properly deductible. In Midland Empire Packing Co., 14 T.C. 635, 640, we quoted from Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, as follows: "It will be noted that the first sentence of the article [now Regulations 111, sec. 29.23(a)-4] relates to repairs, while the second sentence *371 deals in effect with replacements. In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alternations, improvements, or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings." We think that the expenditure here for the windows as described in our findings is distinguishable from a repair expense and should be considered repairs in the nature of replacements, alterations, *372 improvements or additions which prolonged the life of the property. We therefore hold that the respondent's determination on this issue should be sustained. See Ben T. Wright, Inc., 12 B.T.A. 1149. Decision will be entered under Rule 50. Footnotes
*. This stock was being purchased by John P. Homchis under a serial payment purchase agreement dated December 6, 1938. This stock was held in escrow until final payment was made November 6, 1941. The said stock was not voted during escrow period.↩
*. As adjusted by stipulation with conferee.↩